UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CR-373-3-H

| | |
|---|---|
| **United States of America**, <br><br> v. <br><br> **Franky Louis Hoston**, <br><br>            Defendant. | **Memorandum & Recommendation** |

      Defendant Franky Louis Hoston seeks to suppress evidence obtained from his bedroom during a search of a residence at 106 Boyette Circle in Smithfield, North Carolina. Hoston claims that the warrant, which authorized a search of the entire residence, was overbroad, and therefore violated the Fourth Amendment, because his bedroom constituted a separate dwelling unit. He bases this claim upon the fact that there were multiple occupants in the residence and the door to his bedroom required a key to gain entry. The Government contends that the search complied with the Fourth Amendment because it was objectively reasonable for officers to believe that the residence was a single-family home and not a multi-unit dwelling.

      A review of the facts of this case and the applicable case law leads to the conclusion that Hoston's bedroom was simply one room in a larger residence and not a separate unit in a multi-unit dwelling. Cases from multiple circuits, including the Fourth Circuit, have required more than a locked door or multiple occupants to transform a portion of a residence into a separate unit. Hoston cannot demonstrate that any of the indicia of a multi-unit dwelling, such as separate mailboxes, multiple entrances, or formal designation of separate units, were present in this case. Therefore, Hoston's bedroom did not constitute a separate residence and the search of his room was consistent with the Fourth Amendment.

## I. Background

Beginning in April 2015, officers with the Smithfield Police Department began an investigation that led them to believe that Terrell Settles was selling illegal narcotics from a residence at 106 Boyette Circle. Law enforcement began surveillance on the residence and observed multiple vehicles stopping at the residence for short periods of time.

As part of the investigation, officers with the Smithfield Police Department conducted a roadside trash pull. Inspection of trash from the residence uncovered various items consistent with the sale of narcotics; two partially consumed marijuana cigars, multiple pieces of mail addressed to Settles, and two empty boxes for pistol holsters. Officers subsequently contacted the Smithfield Utilities Department and learned that the water bill for the residence was in Settles's name.

Based upon the information gathered during their investigation, Sergeant Tyndall of the Smithfield Police Department submitted an application for a search warrant to a local magistrate. Tyndall's affidavit in support of the application recounted the information law enforcement gathered during its investigation and sought permission to search the residence, which the affidavit described as a "single story, brick, [sic] home …." D.E. 57-2 at 4. Tyndall submitted a photograph of the residence and the surrounding property, which matched this description. The photograph shows a single mailbox at the front of the property.

The magistrate issued a search warrant authorizing law enforcement "to search the premises, vehicle, person and other place or item described in the application for the property and person in question." D.E. 57-2 at 1. Among the items officers were entitled to seize were "[r]ecords, paperwork, showing ownership or possession of the residence" as well as any controlled substances or firearms. *Id.* at 3.

The following morning, officers executed the search warrant. After knocking and announcing their presence a number of times, officers forced open a door to the residence. Officers entered into the kitchen, which was across from the living room. From the kitchen, officers could see a hallway leading to the other end of the residence. There were four doors off of the hallway—two on the left and two on the right—that led to three bedrooms and a bathroom.

Shortly after entering the residence, officers observed Settles walking down the hallway towards them with his hands raised. Officers ordered Settles to get on the ground, which he did, and handcuffed him.

After securing Settles, officers continued down the hallway in an attempt to secure the residence. Officers next came upon Malcolm Bryant's bedroom. Bryant, who was in his bed with his hands up, was handcuffed and secured.

At the end of the main hallway on the left was a closed door. The door, which opened into Hoston's bedroom, had a doorknob with a keyed lock on it. The parties dispute whether the door was locked at the time of execution of the search warrant: Hoston claims that the door was locked and needed to be forced open, while law enforcement claims that the door was unlocked and was opened without the use of any substantial force. Hoston's landlord submitted an affidavit indicating that he was required to replace the door after the raid because it was heavily damaged. After gaining access to Hoston's room, officers found him in bed, under the covers, with his hands up. Officers placed him in handcuffs and removed him from the room. Hoston informed law enforcement that there was a firearm in the drawer next to his bed.

After securing the residence, officers commenced their search, which uncovered various controlled substances, firearms, phones, United States currency, and items which could be

3

utilized in the packaging and sale of narcotics. With respect to Hoston, the search of his bedroom yielded two firearms, a magazine, ammunition, and two cell phones.

A federal grand jury subsequently indicted Hoston on three drug and firearm offenses and aiding and abetting. Hoston now seeks to suppress the physical evidence obtained from the search of his bedroom and any statements he made to law enforcement at the time of the search.

## II. Discussion

Hoston's motion to suppress is based upon the assertion that the residence was not a single family home, but, instead, was a multi-unit dwelling. As a result, Hoston claims, the warrant only authorized a search of Settles, areas that were under his control, and any common areas. Law enforcement should have realized, the theory goes, that Hoston's room was a separate residence and that a separate warrant was required prior to searching it. The failure to obtain a separate warrant prior to searching his room violated his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 20 of the North Carolina Constitution. The Government disagrees and contends that there was no objective indication that the residence contained multiple dwelling units. The Government also argues that even if Hoston's bedroom constituted a separate residence, they were entitled to search his bedroom without a second warrant to ensure the safety of the officers conducting the search.

### A. Alleged Violation of the North Carolina Constitution

Hoston claims that the evidence seized from his bedroom should be excluded because the search violated the North Carolina Constitution.[1] D.E. 58 at 1. The relevant provision states that "[g]eneral warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named,

---

[1] The court notes that although Hoston raises this argument, he makes no further argument to support it.

whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted." N.C. Const. art. I, § 20. However, the Fourth Circuit has rejected the argument that evidence should be excluded in a federal proceeding if it was obtained in violation of a state constitution. *United States v. Clyburn*, 24 F.3d 613, 616–17 (4th Cir. 1994). Instead, the court held that "the Fourth Amendment provides the only proper standard for determining whether evidence seized by state officials pursuant to a state warrant is admissible in federal court." *Id.* at 616–17. Therefore, Hoston is not entitled to exclude evidence seized from his bedroom on the ground that the evidence was obtained in violation of the North Carolina Constitution.

### B. Alleged Violation of the Fourth Amendment

In addition to prohibiting unreasonable searches and seizures, the Fourth Amendment also sets certain baseline requirements for warrants. A warrant is not valid unless it is based "upon probable cause, supported by oath or affirmation, and particularly describ[es] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement, which is the portion of the amendment at issue here, is designed "to prevent general searches." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). It "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id.*

Here, the question is whether a warrant, which explicitly authorized a search of the residence at 106 Boyette Circle, authorized a search of Hoston's bedroom inside the residence. The Supreme Court addressed the particularity requirement in the context of multi-unit dwellings in *Maryland v. Garrison*. In that case, law enforcement sought and received a warrant to search "Lawrence McWebb and 'the premises known as 2036 Park Avenue third floor apartment.'" *Id.*

5

at 80. Both at the time law enforcement applied for the warrant and at the time of the warrant's execution, law enforcement "reasonably believed that there was only one apartment on the premises described in the warrant." *Id.* However, unbeknownst to officers, the third floor actually contained two apartments, one occupied by McWebb and one occupied by Garrison. *Id.* It was only after law enforcement searched Garrison's apartment and located heroin, currency, and drug paraphernalia that they learned the third floor contained two apartments and they were in the wrong apartment. *Id.* Upon learning of their mistake, officers halted their search of Garrison's apartment. *Id.* at 81.

However, the contraband obtained from the search of Garrison's apartment led to charges in state court for violating Maryland's Controlled Substances Act. *Id.* at 80. Prior to his trial, Garrison unsuccessfully sought to suppress the evidence obtained from the search of his apartment on the ground that the warrant was overbroad. *Id.* at 80–81 After his conviction, Garrison's appeal of the denial of his suppression motion eventually made its way to the Supreme Court. *Id.* at 80–81.

The Supreme Court began by analyzing the validity of the warrant itself. The court acknowledged that the description of the place to be searched in the warrant was inaccurate and, therefore, "broader than appropriate…." *Id.* at 85. However, an inquiry into the constitutionality of the officers' actions was to be based on "the information available to them at the time they acted." *Id.* Facts learned after the warrant was issued "have no bearing on whether or not a warrant was validly issued." *Id.* at 85. The court's inquiry should look at "the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." *Id.* In Garrison's case, the Court determined that, based on this standard, the warrant was valid at the

time it was issued and the mistaken belief that there was only one apartment on the third floor did not invalidate it. *Id.* at 85–86.

The court next turned to an evaluation of the constitutionality of the execution of the warrant. The court explained that the constitutionality of the officers' actions would be evaluated "based on the information available as the search proceeded." *Id.* at 87. Thus, if officers had learned prior to beginning their search that the third floor contained two apartments, they would have been limited to searching just McWebb's apartment. *Id.* at 86. Additionally, "they were required to discontinue the search of [Garrison's] apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." *Id.* at 86.

Although this standard would allow officers to search premises beyond those authorized by a validly issued warrant, the Supreme Court has "recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing warrants." *Id.* at 87. Ultimately, the validity of law enforcement's actions in executing the warrant "depends on whether officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 88. With respect to Garrison, the Court determined that their actions were reasonable given the information available to them, so it reversed the Maryland Court of Appeals' decision.

The Fourth Circuit relied upon the reasoning of *Garrison* in *Yanez-Marquez v. Lynch*, 789 F.3d 434 (4th Cir. 2015), a case with several factual similarities to Hoston's. In *Yanez-Marquez*, Immigration and Customs Enforcement ("ICE") agents were investigating whether business owners were housing illegal aliens at a home located at 402 Harbor Drive in Annapolis,

Maryland. *Id.* at 438. Specifically, the agents were aware that an individual by the name of Jose Umana Ruiz resided at the residence. *Id.* at 439.

As part of their investigation, ICE agents sought a warrant to search the residence. The affidavit accompanying the warrant application described the home as a "single-family home[,] a single story building with a shingled roof." *Id.* at 439. It also indicated that a single mailbox with the number 402 on it was located on the front of the property. *Id.* Finally, the affidavit recounted that a search of local property records indicated that the business owners under investigation were the owners of the property. *Id.* A magistrate judge issued the warrant and, seven days later, agents went to the property to conduct the search. *Id.*

Upon arriving at the property, officers knocked on the front door of the residence. *Id.* at 440. Jose Mendoza-Gomez, a resident of the house, answered the door. *Id.* Officers handcuffed him and placed him on a couch in the living room "for officer safety." *Id.* Officers proceeded upstairs and banged on the door to a bedroom occupied by Umana and his long-time partner Maria Yanez-Marquez.[2] Before Umana could open the door "ICE agents broke it down … 'burst' into the room and screamed 'police.'" *Id.* Umana was placed in handcuffs and taken downstairs to the couch. *Id.* Yanez-Marquez was subsequently led downstairs at gunpoint and joined Umana on the couch. *Id.* Agents continued to search the house for additional occupants, but found no one. *Id.*

In her subsequent removal proceedings, Yanez-Marquez claimed that the ICE agents egregiously violated[3] her Fourth Amendment rights because, among other reasons, "the agents

---

[2] It is unclear from the opinion whether law enforcement knew the door led to a bedroom.

[3] There is a different standard for invoking the exclusionary rule in a removal proceeding: the alien must show "(1) a violation of her Fourth Amendment rights; and (2) that the violation was egregious." *Yanez-Marquez*, 789 F.3d at 451. In *Yanez-Marquez*, the court did not need to reach

8

should have known the Premises was a 'two-floor, multi-family dwelling.'" *Id.* at 441. Her argument on this point had two pertinent aspects to it.[4] First, she claimed "that the search warrant was invalid because it identified the Premises as a single family home when it was, in fact, a multi-unit dwelling." *Id.* at 461. Second, she claimed that the agents "should have realized that the Premises was a multi-unit dwelling, and, at that point, they should have stopped the search immediately because the warrant was overbroad." *Id.* Yanez-Marquez argued that the ICE agents should have known that the Premises was a multi-unit dwelling because her bedroom door was locked. *Id.* at 463.

The court began by addressing Yanez-Marquez's first argument regarding the validity of the search warrant. The court applied the holding in *Garrison*—that the validity of a warrant is assessed on the basis of the facts that the agents disclosed or had a duty to disclose to the issuing Magistrate—and determined that the ICE agents conducted a reasonable investigation of the Premises prior to obtaining the search warrant. *Id.* at 462. The court explained that there were no outward indicia indicating that the Premises was a multi-unit dwelling because the Premises was a single-family home that had one mailbox with numbers on it and because a land records search did not reveal that the Premises was a multi-unit dwelling. *Id.*

Next, the court evaluated whether the ICE agents should have realized that the Premises was a multi-unit dwelling during the course of search. The court explained that "[a] locked bedroom door in a home does not necessarily mean or imply that the home is a multi-unit

---

the second part of the inquiry because it concluded that the ICE agents did not violate the Fourth Amendment. *Id.* at 461.

[4] Yanez-Marquez also claimed that her Fourth Amendment rights were violated because "the ICE agents were required to list her as an item to be seized in the warrant." *Id.* at 461. However, that issue is not relevant to the matter presently before the court and was dispensed with in a single paragraph. *Id.* at 463.

9

dwelling." *Id.* at 463. Additionally, the court noted that there was "nothing special or unusual about the bedroom door … that would have put the agents on notice that it was an entrance to a separate living unit" nor was there anything in the interior of the Premises "that would have led agents to believe that it was a multi-unit dwelling." *Id.* Thus, the court concluded, the search did not violate the Fourth Amendment. *Id.*

Based upon the holdings of *Garrison* and *Yanez-Marquez*, the court must analyze two different aspects of the search of the residence to determine whether law enforcement violated Hoston's Fourth Amendment rights. First, the court must determine whether officers knew or should have known at the time they applied for the warrant that the residence was a multi-unit dwelling. Second, the court must determine whether, in the course of executing the search warrant, law enforcement learned information such that they knew or should have known that the residence was actually a multi-unit dwelling.

### 1. Validity of the Warrant

In order to determine whether the warrant was validly issued, the court must consider whether officers knew or should have known that the residence was a multi-unit dwelling when they applied for the warrant. *Garrison*, 480 U.S. at 85. This determination turns on the information available to law enforcement at the time they applied for the warrant that they "disclosed or had a duty to disclose to the issuing" judicial official. *Id.* Any "items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued." *Id.*

Hoston has conceded that the warrant was validly issued. D.E. 58 at 4. Thus, the court concludes that law enforcement possessed a valid warrant at the time they entered the residence and will consider whether the execution of the warrant violated Hoston's constitutional rights.

10

## 2. Execution of the Warrant

The fact that the warrant was valid at the time it was issued does not end the court's inquiry. The court must next consider whether the officers knew or should have known that Hoston's room constituted a separate dwelling prior to entering the room. This inquiry considers "information available as the search proceeded." *Garrison*, 480 U.S. at 87. Law enforcement was required to halt their search of Hoston's room as soon as they "were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." *Id.* If law enforcement failed to appropriately limit their search, the court must consider whether this failure was "objectively understandable and reasonable." *Id.* at 88. In making this final determination, the court must "allow some latitude for honest mistakes that are made by officers in the dangers and difficult process of making arrests and executing search warrants." *Id.* at 87.

This case presents factual circumstances that are substantially similar to those before the Fourth Circuit in *Yanez-Marquez*. In both cases, law enforcement executed a search warrant at what they believed was a single-family residence. Upon entering each residence, officers encountered an occupant who was promptly secured. Next, in both cases, officers came upon a closed and locked[5] door. Officers breached both doors and entered bedrooms occupied by additional and unexpected occupants. In both cases, the occupants of the bedrooms claimed that authorities violated their Fourth Amendment rights because their rooms constituted a separate residence that was not encompassed in the scope of the search warrant.

As noted above, the Fourth Circuit held that the ICE agents' actions in *Yanez-Marquez* did not violate the Fourth Amendment. However, Hoston claims that the decision does not control here for several reasons: (1) *Yanez-Marquez* was an appeal of an immigration case and

---

[5] It is disputed in this case whether the door was locked. The court will presume, without deciding, that the door to Hoston's room was locked.

not a criminal case; (2) the search warrant specified that Settles was the subject of the search and when officers encountered someone other than Settles in the home they should have known it was a multi-unit dwelling; and (3) the door to Hoston's room was unique because of the presence of a doorknob with a keyed lock and should have alerted officers that it was the entrance to a separate dwelling.

Hoston is correct in his assessment that *Yanez-Marquez* was an immigration matter. However, there is nothing in the Fourth Circuit's reasoning or analysis that would compel a different outcome if the case arose in a criminal context. The question before the Court of Appeals there was whether law enforcement's conduct constituted an "egregious violation" of the Fourth Amendment such that evidence should have been suppressed in the removal proceeding. *Id.* at 460–61. However, the Court rejected Yanez-Marquez's claims "for the simple reason that they do not make out a constitutional violation, let alone an egregious one." *Id.* at 461. As this was a "purely legal question," *id.* at 461 n.14, addressing an issue of constitutional law, there is no reason why it should not apply with equal force in this context.

The remaining two arguments are an attempt to distinguish this case from a *Yanez-Marquez* on a factual basis. Hoston contends that the fact that law enforcement was aware that (1) Settles was not the only person living in the residence and (2) that the door to Hoston's room had a doorknob with a keyed lock, should have made them aware that Hoston's room was separate from the remainder of the residence. The combination of these factors, Hoston claims, differentiates this case from *Yanez-Marquez*, where the Fourth Circuit held that "[a] locked bedroom door in a home does not necessarily mean or imply that the home is a multi-unit dwelling." *Id.*

12

However, when confronted with similar circumstances, federal courts have not agreed with Hoston's argument. For example, in *United States v. Kyles*, 40 F.3d 519 (2d Cir. 1994), law enforcement obtained a search warrant to search what was believed to be the apartment of Basil Kyles, a suspect in a bank robbery. *Id.* at 522. Upon arriving at the apartment, officers encountered Basil's mother who told them that she and Basil's brother, Geoffrey, were the only people who lived at the apartment. *Id.* During the search, officers came to a locked door that required a key for entry. *Id.* The suspect's mother told law enforcement that the door led to Geoffrey's room and Geoffrey had the only key to the room. *Id.* After forcing their way into the room, officers found evidence which indicated that Basil resided at the apartment and tied both Basil and Geoffrey to the bank robbery. *Id.*

After being indicted, Geoffrey claimed that the search of his bedroom violated his Fourth Amendment rights. *Id.* at 522–23. Specifically, "[h]e argued that his bedroom was a separate residence not covered by the warrant because the door was locked, only he possessed the key, and he was not named in the affidavit underlying the search warrant." *Id.* The district court denied the motion to suppress and, after his conviction by a jury, Geoffrey appealed. *Id.* at 523.

On appeal, the Second Circuit found Geoffrey's arguments unpersuasive. Despite the multi-occupant nature of the premises, the lock on Geoffrey's door, and his name not being on the warrant, the court determined that "[t]he FBI agents had no reason to believe that Geoffrey's room was a separate residence" because "it had neither its own access from the outside, its own doorbell, nor its own mailbox." *Id.* at 524. Additionally, law enforcement's awareness that Geoffrey had the only key to the bedroom "did not, by itself, elevate the bedroom to the status of a separate residential unit." *Id.* Therefore, the Court of Appeals determined that "the agents

13

were authorized to break the lock and search the room, and the district judge properly admitted the evidence found inside." *Id.*

Another instance of a residence containing more occupants than expected arose in *United States v. Hinds*, 856 F.2d 438 (1st Cir. 1988). In *Hinds*, law enforcement obtained a search warrant in connection with a drug investigation to search a "single family 3-story red brick building ... occupied by Lloyd, Alice, Richard, and Keith Letren." *Id.* at 441. However, upon executing the warrant, law enforcement learned that the residence was actually comprised of four stories. *Id.* While the Letren family occupied the first three stories, the Hinds family lived on the fourth floor. *Id.* Law enforcement searched the entire structure and located "cocaine paraphernalia" in the Hinds's residence on the fourth floor. *Id.* After he unsuccessfully attempted to have the evidence suppressed on the ground that the fourth floor was a separate residence not included in the scope of the warrant, a jury convicted Hinds of conspiracy to distribute cocaine and possession of cocaine with intent to distribute. *Id.* Hinds appealed the denial of his motion to suppress.

Once again, the appellate court rejected the challenge to the particularity of the search warrant. The First Circuit explained that "[w]e do not think that the mere presence of more than one family in a building automatically changes its character from single family to multifamily." *Id.* at 441. The Court of Appeals went on to explain that the search was appropriate because "[t]here were no indications, such as separate doorbells or mailboxes, that more than one family lied at [the residence]." *Id.* at 441–42. Thus, after rejecting other arguments made against the warrant, the district court's decision to deny the motion to suppress was affirmed.

There are a number of other cases that reach similar conclusions. *United States v. McLellan*, 792 F.3d 200, 212 (1st Cir. 2015) ("[A] a warrant for a single-unit residence

14

authorizes the search of that entire dwelling regardless of who the area being searched belongs to, so long as the items delineated in the warrant could reasonably be found in the searched area."); *United States v. Schwinn*, 376 F. App'x 974, 982 (11th Cir. 2010) ("That a dwelling might be shared with others is not, by itself, enough to require officers to exclude portions of that dwelling from the warrant's scope: probable cause often exists to search the entire dwelling because it is reasonable to assume that the suspect has access to the entire dwelling."); *Durham v. McElynn*, 254 F. App'x 892, 896 (3d Cir. 2007) ("While [the defendant] may have had a roommate, this does not convert his single-family home into an apartment house or multi-unit building."); *United States v. Ayers*, 942 F.2d 1468, 1480 (9th Cir. 1991) ("A search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of one of several occupants of a residence.").

These cases demonstrate that a multi-occupant dwelling is not the same thing as a multi-unit dwelling for the purpose of analyzing whether law enforcement should have realized that a search warrant was overly broad in its description of the premises to be searched. Instead, to qualify as a multi-unit dwelling, there must be some indicia that the residence is divided into separate and substantially independent living units. As indicated in the cases discussed above, indicia of a multi-unit dwelling that should alert law enforcement to the need to limit their search or obtain an additional warrant include: multiple doorbells; separate utilities; multiple mailboxes; separate kitchens and bathrooms for each unit; designations on the entry to each unit indicating that it is recognized, at least by the occupants, as being a separate dwelling; and physical separation between units that restrict access by others. This standard does not lend itself to a bright line test, and must be assessed in each case based upon the totality of the circumstances.

Here, after considering the totality of the circumstances, the court concludes that there was nothing present on the date of the search which would have alerted law enforcement that Hoston's bedroom was anything more than one room within a larger home. There is no indication in the record of any of the indicia that would establish Hoston's bedroom as a multi-unit dwelling. The residence itself appears to be a single-family dwelling with only one mailbox. Hoston's bedroom did not contain a kitchen or a bathroom, such that it would be sufficient for independent living. In fact, he shared a bathroom, kitchen, living room, and laundry room with the other residents. The door to Hoston's room did not contain separate lettering or numbering which would have indicated that the residents considered it to be a separate residence. Although there were multiple occupants in the residence and Hoston's door may have been locked, these factors are insufficient to establish his room as a separate unit in a multi-unit dwelling. Therefore, the decision to search Hoston's room was authorized by the search warrant, was reasonable under the circumstances, and was consistent with the Fourth Amendment. As a result, Hoston's motion to suppress should be denied.

### III. Conclusion

For the reasons outlined above, it is recommended that Hoston's Motion to Suppress be denied.

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel. Each party shall have until **Monday, July 18, 2016**, to file written objections to the Memorandum and Recommendation. Each party shall then have until **Monday, July 25, 2016**, to file a response to an objection filed by another party. The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and

Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846–47 (4th Cir. 1985).**

Dated: July 11, 2016

*Robert T Numbers II*

ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE